Good morning, Your Honors. Mark Piquet on behalf of Mr. Silk. Mr. Piquet, please wait until I call you. Oh, sorry. I usually allow both lawyers to find a seat at the table. Mr. Piquet. Thank you. Your Honor, in this case, the question is whether or not this case should have gone to a jury. And it's our belief that there are so many issues here that are raised that mandate the case be sent to the jury. Mr. Silk began working at Moraine College in 1986, and there were absolutely no issues with his teaching ability or what he's done until he had a heart attack in March of 2010. When he had a heart attack, he came back, he's told, he notifies them that he's able to return to work, and the first thing they do is say, well, we need a doctor's slip, which he furnishes immediately. They claim within one week that they immediately replaced him and had someone else in that position. That raises serious questions as to the speed, especially when the information is that there were no finalization as to who would be the teachers until right before the summer classes began. So there's a serious question of why they raced to replace him. Then there's a meeting, and in that meeting they announce that he is going to be taken from a full load in the fall to a partial load. And one of the individuals at the meeting says, we're reducing the load in the fall because we're not sure you're capable of handling it. In my mind, that's all. How many students were in his classes? I'm sorry? How many students were in his classes normally prior to his operation? I think the evidence shows that there were 20 some odd students enrolled. At one point they went into his class and they claimed there were only seven there on a particular day. Seven or eight. Once he came back teaching, how many students were in his class? I don't know if the record reflects the numbers. It tended to, but I was surprised it was so low. It might have been a typo. And again, there's no explanation of why there were few people or what happened. It seems like they try and create an issue here, and part of it deals with his handicap. They say there aren't a lot of people in the class, but at the same time, Mr. Fronsick goes to a class, writes an evaluation, fails to follow the procedures that are established, fails to follow the law, the collective bargaining agreement by giving it to Mr. Silk, and when he walks into the class, according to Silk, he starts antagonizing him right in front of them, and then he tells the students after class, well, if you come here and you give me statements against Mr. Silk, I will raise your grade, and in fact raise the grade, again, contrary to the rules of the college. It seems to me that what we have here is almost what the court said in Bacon, where you've got explanation, delay, exaggeration, and unusual comments, which absolutely conflict with each other. At one point, they say he's a bad employee, and yet at another point, Ms. Donenberg, who made the comment about him being physically unable to attend the class, says that she attended the class, didn't know it was that bad. They also claim that they put him on a do not hire list, which really bothers me. It bothers me because it was never given to anyone. We have documents that just don't seem to ever appear. Mr. Fronsick writes a report criticizing him. He's supposed to publish it and give it to him. He puts it in his drawer. Mr. Cobb, who later gives a report after they filed the EEOC complaint, he doesn't even prepare the report until four months later and then testified that he did it because he issued a report because that was what Mr. Fronsick wanted. We have an issue in terms of do not hire list, where he's then hired after that case by someone else who doesn't know it exists. Now, my problem is there are so many conflicting testimony that I think he's entitled to have a hearing on it. And as I said in the brief, if, in fact, they find any of these, they would raise issues as to why he was fired. If, in fact, he is told that we're not giving you four courses, only two, because of your disability or their perception of a disability, that would create an illegal case. And I'm saying that the mosaic here is such that they're entitled to at least his day in court. I think that you have the failure to put their do not hire list. They claim they went in to see him. He was never given an opportunity to correct it. It would seem to me that logically, if you have a professor or you have an employee who's not doing his work, that, in fact, you go to that employee and you say, by the way, this is it, this is how you have to approve it. When they went to him and said we have... You're saying that a performance improvement plan is required? No, I'm not saying that. I'm just saying that in this case there was one. He was supposed to be given a copy of their performance under the rules, under the Illinois Personnel Code, under their collective bargain agreement. He was told that he would be given a copy of any negative report. He wasn't given that report. That's what concerns me. Why wasn't he given that report? Why didn't they follow the normal procedures of their own school in terms of how they were doing things? In my mind, that raises questions as to why he didn't... why he was terminated and whether it was done because of a perception of his handicap. I am going to reserve time for rebuttal if there are no questions. Certainly, Mr. Piquet. Thank you. Mr. Murray. Please record an opposing counsel. Your Honor, you asked a question about enrollment in the class. After Mr. Silk was returned for the fall semester on a reduced load, the record shows that he had a class that had 28 enrollees. This is on page 6 of our brief. The dean, Mr. Franczak, visited the class to evaluate it, and there were only seven present in the class, among other things. I think that's what Your Honor is referring to. This is a narrow discrimination claim. A plaintiff is claiming that the college reduced his load and ultimately terminated him because they regarded him as being disabled. That means that the plaintiff has to show that the college thought, for example, well, you can teach two classes, Mr. Silk, but we don't think you can teach four. And because of that concern, we're cutting back your class load. The record goes in exactly the opposite direction. Let's focus on the meeting in July of 2010 when the decision was made. I attempted in the brief to kind of parse out who within the bureaucracy was the individual decision-maker. Mr. Franczak, or Dean Franczak, who was the decision-maker as to how many classes to give Silk that semester, and Silk had what amounts to an angry confrontation. Franczak took Silk to the woodshed, saying, you're doing a horrible job. And before we give you a full load back, you've got to demonstrate to this institution that you can handle it, so we're giving you two classes instead of four, and if you can do those classes well, then we'll look at you for the next semester. Whose version is that? That is a consensus version of that meeting. Okay, and that's the same meeting where Donnersberger said, we didn't think you were physically capable of handling the four courses. Yeah, a version that we have to accept at this stage. Right. However, that is correct. However, as the district court pointed out, a single decision-maker as to that... I'm mystified, frankly, by the district court's treatment of that evidence, okay? She says, we. She's what, the department chair, right? She's the department chairperson. She's in a meeting with the dean and with the professor in question, and she says, we have to assume we didn't think you were physically capable of handling four full classes, we've reduced you to two. The nominal decision-maker, Franschek, is in the room, right? He's in the room. He's leading the discussion, Your Honor. And we're supposed to treat Donnersberger's comment as what, a stray remark? In part, yes, and in part below. It's in the meeting, talking about his assignments, and she is speaking for the university, for the college, right? Yes. But, Your Honor, to follow up on that point, I think you have to look at the conduct of the person in charge, Dean Franschek. If he was concerned about the individual's health, he wouldn't have, and nothing else, he wouldn't have gone through this whole litany of, this is what you need to do with your syllabi, this is what you need to do in student presentations. Well, look, the performance problems are crystal clear here, okay? But the problem that I have is really just with the fall 2010 assignment, where you have somebody who obviously is at least deeply involved in the decision-making process saying explicitly, we didn't think you could handle this physically. That sure sounds like regarded as disability discrimination if the employee thinks that he can handle it and has medical evidence to that effect. Well, our point is that the real decision-maker, the dean who's over Donnersberger, made it, and I take it from Your Honor's comment that with respect to the termination, the evidence is crystal clear there that it was performance-based. Ann. I don't, frankly, I think the district court's logic is pretty strong. You've done a helpful job of kind of parsing out the four decisions, and my concern is with the second, where the rationale for summary judgment seems to have been that with two agents, two supervisors for the college in the room, we should ignore what one of them said according to the evidence. Well, it should be outweighed by the conduct because there is no rationale for giving somebody a reduced load with all of this work and kind of an angry confrontation, if you recall, Your Honor, between Franczak and a plaintiff regarding Moraine Valley students not paying the quality of Harvard and what. You do a lot of employment discrimination law. What does an opinion look like that says from this court that we cannot give any weight to Donnersberger's comment? Because that, well, in addition to what the district court said, because obviously Your Honor is part of the company with that. At least it doesn't cut ice with me. Because it does not create a material issue in light of all of the other evidence in the record that the college was aware that he got a clean bill of health, that they assigned him to classes, that they continued to employ him when they had absolutely no reason not to employ him, and there is no rational basis for a fact finder to determine that the college made a conscious decision, because this is an intent element, that the college made a conscious decision that we're going to assign Mr. Silk to two instead of four classes because we were concerned about the lingering effects of, actually it was bypass surgery, it wasn't a heart attack. So that's my response to that. In terms of the actual termination, amply supported by facts and really undisputed. As to the retaliation claim, I think the record is clear as what happened was a bureaucratic slip-up. And as a result, the president of the college corrected what should never have happened, meaning that the guy shouldn't have been brought back. So of the four decisions, the first one, meaning the summer school classes, the record is really undisputed that what happened there is that Mr. Silk took leave, he came back, in the meantime they're trying to fill the summer schedule, and the medical release didn't come in until such time as the classes were filled, which is not evidence of any perceived disability discrimination. From the plaintiff's evidence on that point, I gather that the summer assignments were not necessarily carved in stone at that point, but the management of the college had in essence made commitments to people that they felt obliged to stick with. That's what the record reflects. And these part-timers get kind of like the overflow jobs that the full-timers don't want. So there was certainly no indication of an intent to deny it because of the disability, it's just they didn't know and didn't get the release. In my remaining time, I'd like to discuss the threshold issue of the transitory and minor, which we briefed and which the district court rejected. As far as our research, my research indicates, there's not much law at this level on how that is to be interpreted. Obviously, this case satisfies the transitory element of less than six months because Mr. Silk was released no later than May 10. But don't we have to be asking how his condition was regarded?  There is an exception to the regarded as. In other words, it's in the statute. It's an objective test. It's an objective test for disability generally. Is it an objective test when we're talking about regarded as? Yes. Interesting. And here we have a bypass replacement job where the individual is back to work within two weeks. And at least a number of the district court cases would indicate that that is not the type of absence that falls within the general regarded as. It's the exception. Now, Judge Amblin, to be sure, it's our burden on that, but the facts are really undisputed in that regard, a repair, a return to work a couple of weeks later. And if the court finds in favor of the college on the transitory and minor issue, that ends the case, at least as to the ADA claim and not as to the retaliation claim. Thank you very much, Counsel. Thank you, Your Honor. Anything further, Mr. Piquet? Yes. Your Honor, Counsel made a comment that there's no rational basis. Well, it seems to me that he's raising issues of fact. If there are questions as to whether there's a rational basis for something, that means there are facts here that mandate it should go to the jury. The other comment that he made was there was a bureaucratic slip-up at the end. I don't think it was a bureaucratic slip-up. There are real questions as to whether or not the do-not-hire list was there. And what concerns me more is that other people at the college felt confident in Mr. Silk to hire him, and there was no, quote, bureaucratic slip-up until after he filed the EOC charges. It seems to me that that's a major difference what we have is an individual who they claim was put on a do-not-hire list but was never told he was fired. They never came forward and said to him, we are letting you go, we don't think your performance is good, and this court has looked at that type of issue in considering whether or not there is this myriad of differences of, what do they call it, a convincing myriad of different issues that are given. When they change their story or they don't give a consistent story, that is an issue for the jury then to decide and to justify going to the jury. I think the case involved in the issue in terms of transitory doesn't exist. I think that transitory is not involved here because of the fact that they said to him, we think that you may not be able to do the work where they treated it as a continuing obligation. Your Honors, I would ask that the case be reversed and sent back to the district court for trial. Thank you. Thank you very much. Counsel, the case is taken under advisement.